UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MONTY RAY STAGNOLI | ) | Case No.  06-60434-jms |
| BETSY ANN STAGNOLI | ) | |
| | ) | Chapter 7 |
| Debtors | ) | |
| | ) | |
| JAMES R. WESTENHOEFER | ) | |
| | ) | ADV. PRO. NO.  06-6111 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTRYWIDE HOME LOANS, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## TRIAL BRIEF

Comes the Defendant Countrywide Home Loans, Inc., and respectfully submits the following trial brief.

## FACTUAL BACKGROUND

Debtors Monty Ray Stagnoli and Betsy Ann Stagnoli are the owners of real property located on Rural Route 1, Monticello, Kentucky.  The Stagnolis acquired this property by deed dated September 3, 1998, of record on Deed Book 265, Page 314, of the Wayne County Clerk's Office.

On February 2, 1999, a certificate of title was issued to the Stagnolis with respect to a 1995 Fleetwood Stonebridge double-wide mobile home.  This mobile home is located on the real property owned by the Stagnolis.  This certificate of title indicates that such mobile home was

subject to a security interest in favor of North American Mortgage Company. A copy of such Certificate of Title is attached as Exhibit 1.

On October 2, 2001, the Stagnolis borrowed $64,800.00 from Defendant Countrywide Home Loans, Inc. Defendant believes that as a part of such loan transaction, the Stagnolis executed that affidavit of conversion to real estate attached hereto as Exhibit 2. The Stagnolis' loan was secured by that mortgage dated October 2, 2001, of record in Mortgage Book 218, Page 61 of the Wayne County Clerk's Office. A copy of such mortgage is attached hereto as Exhibit 3. Unfortunately, the affidavit of conversion was not recorded prior to the Stagnolis' petition. Plaintiff has not made a claim that such mortgage is avoidable, Plaintiff is merely seeking to avoid Defendants security interest in the mobile home.

## STATEMENT OF ISSUES

Plaintiff seeks to avoid the lien of Countrywide against the mobile home by arguing that because Defendant did not have its lien noted on the certificate of title, it did not protect its security interest. It would be difficult to argue with that position if Defendant were claiming a security interest in the mobile home, separate and apart from the mobile home's status as permanently affixed improvements to the Stagnoli's real property. Countywide is not claiming it has a security interest. It is merely asserting that it has a mortgage lien against such mobile home as part of the real property, which mortgage lien may not be avoided and which is prior and superior to the claims of Plaintiff.

Defendant believes the Trustee, as either a hypothetical purchaser or lien creditor, has no ability to assert rights in the manufactured home which are superior to Countrywide's lien claim. The mobile home lost its character as personalty both by being permanently affixed to the real

property and by the Debtors' execution of an affidavit of conversion to real property. The Debtors have no separate ownership interest in the mobile home beyond their title to the real property. Because Countrywide has a prior, perfected mortgage with regard to the real property, its interest in the manufactured home is prior to the Trustee's hypothetical lien or purchaser status.

This result is borne out by an examination of Kentucky law concerning judgment liens against personal property. In order for a judgment lien to attach and be superior to an unperfected security interest, there must be some personal property found to attach. South Bay Enterprises, Inc. v. Mirada Bay Petroleum, Inc., Ky.App., 957 S.W.2d 287 (1997). Quite simply, the debtor has no separate rights to the mobile home as personal property. The mobile home is, at worst, a fixture subject to the mortgage of Countrywide pursuant to KRS 355.9-502. Any attempted execution on the manufactured home as personal property would be impossible because the Debtors lack title separate and apart from their deed to the real property because they surrendered the title.

The Trustee is a judgment lien creditor with regard to the real property, however. The Trustee's claim of lien creditor on the real property, improvements, and fixtures is subordinate to Countrywide mortgage. Because the Trustee's status as a lien creditor or purchaser is determined by state law, he simply has no prior lien with respect to the manufactured home.

Further, Countrywide believes the Kentucky legislature allowed for an alternative method of perfecting a lien against in a manufactured home by statutorily providing that one obtaining a mortgage lien against a mobile home does not have a security interest but rather an "encumbrance." Although KRS 186A.190 clearly states that perfection must be made by

notation on the certificate of title, that statute was originally enacted in 1982 and by its terms is

limited to "security interests".

In 2000, the Kentucky legislature adopted revised Article 9.  KRS 355.9-102 contains the

bulk of the definitional provisions to be applied to Article 9.   Subsections (ba) and (bb),

respectively, define "Manufactured Home" and "Manufactured-home transaction" as follows:

> (ba) "Manufactured home" means a structure, transportable in one
> (1) or more sections, which, in the traveling mode, is eight (8)
> body feet or more in width or forty (40) body feet or more in
> length, or, when erected on site, is three hundred twenty (320) or
> more square feet, and which is built on a permanent chassis and
> designed to be used as  dwelling with or without a permanent
> foundation when connected to the required utilities, and includes
> the plumbing, heating, air-conditioning, and electrical systems
> contained therein.  The term includes any structure that meets all of
> the requirements of this paragraph excerpt the size requirements
> and with respect to which the manufacturer voluntarily files a
> certification required by the United States Secretary of Housing
> and Urban Development and complies with the standards
> established under Title 42 of the United States Code.
>
> (bb)  "Manufactured-home  transaction"  means  a  secured
> transaction:
>
> 1.    That creates a purchase-money security interest in a
> manufactured home, other than a manufactured home held as
> inventory; or
>
> 2.  In which a manufactured home, other than a manufactured
> home held as inventory, is the primary collateral.

At the same time, the legislature also enacted KRS 355.9-334, which sets forth the

priority scheme for security interests in fixtures.  Subsection 5(d) of KRS 355.9-334 determines

the relative priority between an "encumbrancer" and a secured party who has perfected its

security interest in a manufactured home "pursuant to a statute described in

KRS 355.9-3111(1)(b)."   KRS 355.9-334(5)(d) grants such a secured party priority over the

encumbrancer.  Because KRS 355.9-311(1)(b) refers to KRS Chapter 186A.  It is clear that the legislature must have recognized that other liens could be created against mobile homes, simply because the legislature felt it was necessary to create a priority scheme to resolve a situation involving both security interests and encumbrances.

"Encumbrance" is defined in KRS 355.9-102 as "a right, other than an ownership interest, in real property.  The term includes mortgages and other liens on real property." Defendant believes that the priority scheme set forth in KRS 355.9-334 makes clear that the legislature intended that manufactured homes which are located on real property could be encumbered by a real estate mortgage, because the legislature provided that such a mortgage would be inferior to a security interest perfected pursuant to KRS 186A, if such a security interest existed.  If a lien against a mobile home could not be perfected pursuant to a mortgage or fixture filing, there would simply be no reason to provide the priority scheme with respect to title notation versus mortgage contained in KRS 355.9-334(5).  It is quite possible that the legislature recognized the widespread use of manufactured housing in Kentucky, and the fact that by the second or third conveyance of real property on which such housing was located, no one was actually transferring title to the manufactured home.  Under the statutory scheme contained in KRS 355.9-334, therefore, Countrywide's properly recorded mortgage encumbers the manufactured home.  Countrywide is entitled to a first lien because no other party has a lien noted on the certificate of title.

## CONCLUSION

Debtors have no separate certificate of title to the manufactured home which is at issue in this case.  That has been surrendered pursuant to the affidavit of conversion.  Their only current

claim to ownership is through the deed which transferred the real property to them.  It is

undisputed that Countrywide has a properly recorded mortgage against the real property,

improvements, and fixtures.  Countrywide believes it is entitled to a judgment declaring it to be

the holder of a valid lien against the manufactured home specifically because Countrywide has

properly encumbered all of the Debtors' indicia of ownership and the Kentucky legislature has

now provided that a lien can be perfected against a manufactured home by a mortgage.

## EXHIBIT LIST

1.      Certificate of Title.

2.      Affidavit of Conversion.

3.      Mortgage.

Respectfully submitted,

/s/ John P. Brice
John P. Brice, Esq.
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY  40507-1746
Telephone:     (859) 233-2012
Facsimile:     (859) 259-0649
Email: jbrice@wyattfirm.com

and

/s/ Bradley A. Reisenfield
Bradley A. Reisenfeld (86613)
2035 Reading Road
Cincinnati, OH  45202
Telephone:     (513) 322-7000
Facsimile:     (513) 322-7033
Email:  bareisenfeld@rslegal.com

COUNSEL FOR COUNTRYWIDE MUTUAL, INC.
d/b/a COUNTRYWIDE MUTUAL BANK

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Trial Brief has been served this 5th day of January, 2007, in the method established under the CM/ECF Administrative Procedures Manual and the Local Court Standing Order dated July 25, 2002, upon the following:

/s/ John P. Brice
John P. Brice

James R. Westenhoefer, Trustee
212 South Third Street
Richmond, KY  40475

Thomas Canary
801 W. Jefferson Street
Louisville, KY  40202

Monty Ray Stagnoli
Rural Route 1, Box 4711
Monticello, KY  42633

Betsy Ann Stagnoli
Rural Route 1, Box 4711
Monticello, KY  42633

30436967.1



COMMONWEALTH OF KENTUCKY
TRANSPORTATION CABINET
CERTIFICATE OF TITLE

| TITLE NO. | YEAR | MAKE | VIN | TITLE TYPE |
|---|---|---|---|---|
| 990081160014 | 95 | FTWD | INFLR27A809201SR | TRANSFER |

| MODEL NAME | MODEL NO. | TYPE/BODY | COLOR | NO.CYL. | ODOMETER |
|---|---|---|---|---|---|
| STONERD | 28X52 | HS | WHTGRN | 00 | 0 |

| MOTOR NO. | WEIGHT | USAGE TAX PAID | PREVIOUS TITLE NO./STATE |
|---|---|---|---|
| | 0 | 0.00 | 9833811600005 KY |

OWNER(S) NAME

STAGNOLI, MONTY AND BETSY
RT 1 BOX 4711
MONTICELLO        KY 42633-9801

DATE OF ISSUE
02/02/99

400928356

FIRST LIENHOLDER
NORTH AMERICAN MTG C
3883 AIR WAY DRIVE
SANTA ROSA        CA 95403

SECOND LIENHOLDER

REMARKS

BRANDS

| FIRST LIEN | |
|---|---|
| Notation No. M315*3 | County WAYN |
| Filing date 01-08-99 | |
| Released By | |
| County Clerk Only | DATE |
| SECOND LIEN | |
| Notation No. | County |
| Filing date | |
| Released By | |
| County Clerk Only | DATE |

CONTROL NO.

B8741648

I hereby certify that the Department of Vehicle Regulation has exercised due diligence in examining an application for a certificate of title and that above-described vehicle and to the best of our knowledge and belief the applicant whose name appears above is the lawful owner of the apparently legitimate vehicle described herein.

Commissioner,
Department of Vehicle Regulation

TC 96 - 180 REV. 7/97

DO NOT ACCEPT TITLE SHOWING ANY ERASURES, ALTERATIONS OR MUTILATIONS

Plaintiff's Exhibit B
Page 1 of 1



EXHIBIT
1

# AFFIDAVIT OF CONVERSION TO REAL ESTATE

*515*

The Undersigned swear (or affirm) that they are the owner(s) of

the manufactured home (mobile home) known as:

Make _1995_____, Model _Fleetwood_____

Serial Number _TNFLR27ABO9201SR____, Kentucky Certificate of

Title number _9900846ooi4____, has been or will be permanently affixed to

real estate in _Wayne_____ County, Kentucky as described in Deed

Book number _265_, Page number _314___, in said County.   Pursuant to

Chapter 186A, the aforementioned Kentucky Certificate of Title is hereby

surrendered.

_Monty Stagnole_____
Owner

_Betsy Stagnole_____
Owner

_RR 1 Box 4711_____
Street Address

_Monticello, Ky 42633_____
City, State and Zip Code

FILED FOR RECORD
2001 SEP 18 PM 2:00
ATTEST CAROL JONES
WAYNE CO. CLERK

Subscribed and sworn to before me this _2_ day of _octobe_, 20 _01_

_Marcus Daly_____
NOTARY PUBLIC  MARCUS DALY

My commission expires _1/27/03_, 20 _

01 IN 08884

EXHIBIT
2

# COMMONWEALTH OF KENTUCKY
## TRANSPORTATION CABINET
### CERTIFICATE OF TITLE

| TITLE NO. | YEAR | MAKE | MODEL NAME | VIN/HIN | TITLE TYPE | MODEL NO. |
|---|---|---|---|---|---|---|
| 062411160003 | 95 | FTWD | STONERD | TNFLR27AB09201SR | DUPLICATE | 28X52 |

| BODY TYPE | COLOR | NO. CYL | ODOMETER | MOTOR NO. | WEIGHT | PREV. TITLE NO./STATE |
|---|---|---|---|---|---|---|
| HS | WHIGRN | 00 | 0 | | | 990081160014 KY |

| KY NO. | BOAT TYPE | LENGTH | BEAM | CAPACITY | HULL MATERIAL | PROPULSION |
|---|---|---|---|---|---|---|
| | | | | | | |

OWNER(S) NAME

STAGNOLI, MONTY AND BETSY
RT 1 BOX 4711
MONTICELLO       KY 42633-9768

DATE OF ISSUE 08/29/06     FUEL     USAGE TAX PAID 0.00

REMARKS

*Conversion to Real Estate 9/18/06.*

BRAND(S)

FIRST LIENHOLDER
NORTH AMERICAN MTG
3983 AIR WAY DRIVE
SANTA ROSA
CA 95403

SECOND LIENHOLDER

| Notation No. | FIRST LIEN | County | Notation No. | SECOND LIEN | County |
|---|---|---|---|---|---|
| | M31543 | WAYN | | | |
| Filing Date | 01-08-99 | | Filing Date | | |
| Released By: | | | Released By: | | |
| County Clerk's use Only | Carol Jones 9/18/2006 | | County Clerk's use Only | | |
| | Date | | | | Date |

I certify that the Department of Vehicle Regulation has exercised due diligence in examining an application for a certificate of title for the above-described vehicle and to the best of our knowledge and belief the applicant whose name appears above is the lawful owner of the apparently legitimate vehicle described herein.

(STATE SEAL)

Commissioner, Department of Vehicle Regulation

CONTROL NO. C09938398

FEDERAL AND STATE LAW REQUIRES THAT YOU STATE THE VEHICLE MILEAGE IN CONNECTION WITH THE TRANSFER OF OWNERSHIP. FAILURE TO COMPLETE, OR PROVIDING FALSE STATEMENT, MAY RESULT IN FINES AND/OR IMPRISONMENT.

**FIRST DEALER ASSIGNMENT**

The undersigned owner hereby certifies that the vehicle described in this title has been transferred to the following (print name and address of transferee):

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked.

****CAUTION READ CAREFULLY BEFORE YOU CHECK A BLOCK****

Odometer Reading _____ (no tenths)
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING-ODOMETER DISCREPANCY

Transferor(s) Signature(s) _____ (Seller) To be notarized    Transferee(s) Signature(s) _____ (Owner)

Transferor(s) Printed Name(s) _____ (Seller)    Transferee(s) Printed Name(s) _____ (Owner)

Date of Transfer _____    Seller Dealer No. _____    Purchasing Dealer No. _____

Attesting Official _____    Title _____

Subscribed and sworn before me this _____ day of _____ 20___ My commission expires _____    NOTARY PUBLIC

**SECOND DEALER ASSIGNMENT**

The undersigned owner hereby certifies that the vehicle described in this title has been transferred to the following (print name and address of transferee):

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked.

****CAUTION READ CAREFULLY BEFORE YOU CHECK A BLOCK****

Odometer Reading _____ (no tenths)
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING-ODOMETER DISCREPANCY

Transferor(s) Signature(s) _____ (Seller) To be notarized    Transferee(s) Signature(s) _____ (Owner)

Transferor(s) Printed Name(s) _____ (Seller)    Transferee(s) Printed Name(s) _____ (Owner)

Date of Transfer _____    Seller Dealer No. _____    Purchasing Dealer No. _____

Attesting Official _____    Title _____

Subscribed and sworn before me this _____ day of _____ 20___ My commission expires _____    NOTARY PUBLIC

DO NOT ACCEPT TITLE SHOWING ANY ERASURES, ALTERATIONS, OR MUTILATIONS. MUST BE COMPLETED IN BLUE OR BLACK INK. FEDERAL AND STATE LAW REQUIRES THAT YOU STATE THE VEHICLE MILEAGE IN CONNECTION WITH THE TRANSFER OF OWNERSHIP. FAILURE TO COMPLETE, OR PROVIDING FALSE STATEMENT, MAY RESULT IN FINES AND/OR IMPRISONMENT.

DEALER ONLY

STATE OF KENTUCKY
COUNTY OF WAYNE §

I, Carol Jones, Clerk of the Wayne County Court, certify that on the 18 day of Sept 2006, at 2:00 A.M./P.M. the foregoing *Conversion* was produced to me certified as above and lodged for record. Whereupon I have recorded the same, together with this certificate, this 19 day of Sept 20 06 in Book MS No. 15 Page 515.

Attest, Carol Jones

By _____ D.C.

61

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
1800 Tapo Canyon
Simi Valley, CA 93063-6712

NATION'S TITLE AGENCY
9300 SHELBYVILLE ROAD
SUITE 1020
LOUISVILLE, KY 40222

Prepared By:
T. SUTTON

AMERICA'S WHOLESALE LENDER

100 MALLARD CREEK ROAD
LOUISVILLE,
KY 40207.

NATIONS TITLE AGENCY
9300 SHELBYVILLE ROAD
SUITE 1020
LOUISVILLE, KY 40222

———————————————— [Space Above This Line For Recording Data] ————————————————

011N08884                          000097980241201
[Escrow/Closing #]                 [Doc ID #]

# MORTGAGE

MIN 1000157-0000599058-1

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3,
11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in
Section 16.

KENTUCKY -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 16                                                    Initials:

-6A(KY) (0006)      CHL (08/00)      VMP MORTGAGE FORMS - (800)521-7291              Form 3018 1/01
CONV/VA

*23991*                    *000979802000001006A*

Plaintiff's Exhibit A
Page 1 of 16

EXHIBIT

3

62

DOC ID # 000097980241201

(A) "Security Instrument" means this document, which is dated OCTOBER 02, 2001        , together
with all Riders to this document.
(B) "Borrower" is
MONTY STAGNOLI, AND BETSY STAGNOLI, HUSBAND AND WIFE

Borrower is the mortgageor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this
Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is
AMERICA'S WHOLESALE LENDER
Lender is a   CORPORATION
organized and existing under the laws of  NEW YORK
Lender's address is
 4500 PARK GRANADA, CALABASAS, CA 91302-1613
(E) "Note" means the promissory note signed by Borrower and dated OCTOBER 02, 2001
The Note states that Borrower owes Lender
SIXTY FOUR THOUSAND EIGHT HUNDRED and 00/100
Dollars (U.S. $    64,800.00    ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than OCTOBER 01, 2021         . This Security
Instrument secures 150% of the principal amount of the Note.
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due
under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
|---|---|---|
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] |

0

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances
and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable
judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association
or similar organization.

Plaintiff's Exhibit A
Page 2 of 16

Initials: _BS_ _MK_

63

DOC ID # 000097980241201

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the
COUNTY                                          of WAYNE                                          ¦
    [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Plaintiff's Exhibit A
Page 3 of 16

Tax Parcel ID Number:                                          which currently has the address of
RR1 BOX 4711, MONTICELLO

                                          [Street/City]
Kentucky 42633        ("Property Address"):
    [Zip Code]

Initials: _____

-6A(KY) (0005)        CHL (08/00)        Page 3 of 15                    Form 3018 1/01

*64*

DOC ID # 000097980241201

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

Plaintiff's Exhibit A
Page 4 of 16

65

**DOC ID # 000097980241201**

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

Plaintiff's Exhibit A
Page 5 of 16

DOC ID # 000097980241201

66

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower. Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Plaintiff's Exhibit A
Page 6 of 16

67

DOC ID # 000097980241201

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Plaintiff's Exhibit A
Page 7 of 16

*68*

DOC ID # 00009798024l201

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make

DOC ID # 000097980241201

69

separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

Initials: _BS_ _M.d~_

Plaintiff's Exhibit A
Page 9 of 16

DOC ID # 000097980241201    *70*

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

Plaintiff's Exhibit A
Page 10 of 16

DOC ID # 000097980241201

*7 /*

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Plaintiff's Exhibit A
Page 11 of 16

DOC ID # 000097980241201

72

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

Plaintiff's Exhibit A
Page 12 of 16

DOC ID # 00009798024120I

73

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

Plaintiff's Exhibit A
Page 13 of 16

DOC ID # 000097980241201        *74*

**25. Taxes and Assessments on Mortgage Insurance Premiums.** If mortgage insurance premiums are required to be paid by Borrower pursuant to Section 10, then in addition to such premiums, Borrower shall pay all taxes and assessments thereon for so long as Borrower is required by Lender to pay the premiums. All taxes and assessments on premiums due and payable by Borrower shall be considered an Escrow Item and shall be paid by Borrower to Lender in the manner provided for Escrow Items in Section 3.

**26. Future Advances.** This Security Instrument shall secure the payment of any and all renewals, extensions or amendments of the debt secured hereby in whole or in part and any documents evidencing such debt, including, without limitation, any and all renewals, extensions or amendments of, and replacements or substitutions for the Note, and no renewals or extensions shall be deemed a payment so as to discharge this Security Instrument. As permitted by KRS 382.520, this Security Instrument secures not only the initial advance(s) under the Note, but also all future advances and all other additional debt, including, without limitation, any sums, with interest, advanced under Sections 7 or 9 hereof, whether direct, indirect, existing, future, contingent or otherwise, connected with or arising out of the Note or this Security Instrument, as the same may hereafter be amended, to the extent of not more than 150% of the principal amount of the Note and whether or not evidenced by notes, accounts or obligations of any kind whatsoever. It shall be a default under this Security Instrument if Borrower requests a release, in the manner by KRS 382.520, of any portion of the lien securing any of the additional indebtedness secured by this Security Instrument pursuant to KRS 382.520 prior to the date that all of the obligations secured by this Security Instrument have been paid and discharged and the Note and this Security Instrument have been terminated, and Borrower hereby waives any and all right to request such a release to the maximum extent permitted by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _Monty Stagnoli_____ (Seal)
                                      MONTY STAGNOLI                -Borrower

_____        _Betsy Stagnoli_____ (Seal)
                                      BETSY STAGNOLI               -Borrower

                                      _____ (Seal)
                                                                   -Borrower

                                      _____ (Seal)
                                                                   -Borrower

Plaintiff's Exhibit A
Page 14 of 16

-6A(KY) (0005)        CHL (08/00)              Page 14 of 15

STATE OF KENTUCKY, _Wayne_    DOC ID # 000097980241201    75

County ss:

The foregoing instrument was acknowledged before me this _10/2/01_

by _Monry Stagnoli and Betsy Stagnoli_

My Commission Expires: _1/27/03_

Notary Public

-6A(KY) (0005)    CHL (08/00)    Page 15 of 15    Initials: _BS ML_

Form 3018 1/01

Plaintiff's Exhibit A
Page 15 of 16

76

Legal Description for 01IN08884:

Being Lots Nos. 196 and 197 of Cedar Bluff Shores Subdivision as shown by a plat of record in the office of the Wayne County Court Clerk in Plat Book 2, at page 59.

Being the same property conveyed to Monty Stagnoli and Betsy Stagnoli, husband and wife, by deed dated August 26, 1998, and recorded September 3, 1998, in Deed Book 265, page 314, in the Office of the Clerk of Wayne County, Kentucky.

STATE OF KENTUCKY §
COUNTY OF WAYNE  §

I, Carol Jones, Clerk of the Wayne County Court, certify that on the ____11____ day of
____Oct____ 20 _01_ at _11:01_ A.M. the foregoing ____mtg____
was produced to me certified as above and lodged for record. Whereupon I have recorded the same,
together with this certificate, this ____11____ day of ____Oct____
20 _01_ in Book No. ____278____ Page ____61____
Attest: Carol Jones
By Brenda Corder D.C.

Plaintiff's Exhibit A
Page 16 of 16